Filed 1/23/14  In re Frankie L. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re FRANKIE L., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B248735 (Super. Ct. No. JV50690) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,   Plaintiff and Respondent, v. V.M.,   Defendant and Appellant. | |

V.M. appeals the juvenile court's order denying her petition to modify an order placing her minor grandson Frankie L. with his prospective adoptive parents (Welf. & Inst. Code,[1] § 388).  The trial court denied the petition in conjunction with terminating the parental rights of Frankie's father and ordering a permanent plan of adoption

_____

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

(§ 366.26).[2]  Appellant contends that she demonstrated changed circumstances and that placing Frankie with her would be in the child's best interests.  She also claims the court abused its discretion in failing to grant her visitation with Frankie.  We affirm.

STATEMENT OF FACTS

When Frankie was born in 2005, he and mother tested positive for drugs.  They moved in with appellant shortly thereafter.  Mother continued to use drugs and died in January 2007.  Frankie remained in appellant's custody while father was in prison on a drug-related charge.

In 2009, Frankie began spending the summer and holidays with father and his wife; the rest of the year he lived with appellant.  In August 2011, appellant took Frankie without permission from the home of his step-siblings' father, R.L.  Father was subsequently granted full legal and physical custody of Frankie.

On March 6, 2012, a dependency petition was filed alleging that father and his wife were using drugs and engaging in domestic violence.  (§ 300, subds. (b), (g)).  Frankie was placed with R.L., who is considered a non-relative extended family member (NREFM).  Father was granted reunification services and the matter was set for a six-month review hearing.

In July 2012, the San Luis Obispo County Department of Social Services (DSS) recommended that appellant be allowed to visit Frankie.  Father "admitted that he had 'slandered' his mother during the early part of the investigation, lied about things in the past and that none of these things were true.  He has indicated several times that he is no longer interested in participating in Family Reunification services and wishes to have the child placed with [appellant] . . . as a permanent placement."  DSS noted that appellant had been approved as a potential placement and was "considered a potential concurrent plan for the child.  It is the hope of [DSS] that Frankie can go on a visit and begin to transition to placement with [appellant] permanently."

_____

[2] Frankie's father E.M. (father) is appellant's son.  Frankie's mother (mother) is deceased.

At the six-month review hearing, DSS recommended that father's reunification services be terminated because he had only made minimal progress on his case plan. Although father still wanted Frankie to be placed with appellant, DSS no longer supported this plan. Frankie enjoyed his visits with father and appellant, but he preferred his current placement and was thriving in it. DSS reported that appellant "has a very difficult time containing her emotions and becomes highly emotional in a very short period of time. . . . [Appellant] becomes very dramatic when describing a situation that involves her and [father]. It has been observed that [appellant] attempts to embellish the circumstances surrounding an event in order that she may appear to be the victim." It was discovered that appellant and father were engaging in domestic disputes and "[appellant] has demonstrated having little to no boundaries with her son. [Appellant] has stated that she is extremely fearful of her son and it appears that he is able to manipulate her to the point where [appellant] makes poor personal choices." The Court Appointed Special Advocate (CASA) supported DSS's recommendation.

Notwithstanding DSS's recommendation, the court granted father an additional six months of services and set the matter for a 12-month review hearing. Frankie was continued in his placement with R.L.

On October 19, 2012, appellant applied for de facto parent status.[3] DSS opposed the request, which the court denied on November 1, 2012.

On November 7, 2012, DSS filed a form JV-180 request that father's reunification services be terminated due to arrest for possession of a controlled substance and a new report of domestic violence against his wife. At a hearing on December 13, 2012, the court terminated reunification services and set the matter for a permanency planning hearing (§ 366.26) on April 10, 2013.

---

[3] A de facto parent is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 5.502(10).) "On a sufficient showing, the court may recognize the child's present or previous custodian as a de facto parent and grant him or her standing to participate as a party in the dispositional hearing and any hearing thereafter at which the status of the dependent child is at issue." (Cal. Rules of Court, rule 5.534(e).)

Appellant filed another request for de facto parent status on December 17, 2012, then withdrew that request on December 27, 2012.  On February 14, 2013, Frankie was placed with his prospective adoptive parents.**4**  On February 27, 2013, appellant filed yet another request for de facto parent status.  This time, the court granted the request over DSS's objection.  The court told appellant:  "[Y]ou probably are aware that Frankie currently is in a home that . . . [DSS] has been looking to as . . . the permanent plan, for Frankie.  This does not change that, as you know.  But it certainly confirms the relationship that you had with your grandson in the past and the importance that you want to continue to have and be involved in this case, and that's what I'm granting by way of this request."

On March 22, 2013, appellant filed a section 388 modification petition (form JV-180) requesting that Frankie be immediately placed with her.  Appellant also asked the court to order a bonding study.  On April 8, 2013, DSS filed a modification petition requesting that the court discontinue visitation between Frankie and father while father was incarcerated.  The court granted DSS's petition and suspended Frankie's visitation with father.  Appellant's section 388 petition was set to be heard in conjunction with the section 366.26 hearing.

At the combined section 388 and section 366.26 hearing, DSS opposed appellant's request that Frankie be removed from the custody of his prospective adoptive parents and placed with her.  The social worker reported that Frankie was doing well in his placement.  The social worker also indicated that she had reassessed appellant as a possible permanent placement for Frankie.  Appellant had ultimately been ruled out as a placement option based on prior information, the social worker's recent interactions with appellant, and the social worker's observations of appellant's relationship with Frankie during their supervised visits.  The social worker noted that father claimed appellant regularly used marijuana and was "neglectful and abusive" when father was a minor.  Although father "has gone back and forth" with regard to whether he wanted Frankie to

---

**4** The prospective adoptive parents are a NREFM and her husband.

4

live with appellant, he most recently told the social worker that he wanted Frankie to remain in his current placement and did not want appellant to be considered as a placement option. According to appellant, father had "changed his position" again and wanted Frankie to be placed with appellant.

The social worker also reported that appellant "has made many conflicting statements/gestures regarding [father]." Although appellant claimed to be afraid of father, she and father came to a September 2012 hearing together and were holding hands. Appellant told the social worker "this is a lie," even though the CASA and DSS staff had observed it. The social worker also referred to instances when appellant displayed emotionally unstable behavior with DSS staff and CASA. When the social worker attempted to discuss the case with appellant on two occasions, appellant "became immediately defensive, angry, and hostile, yelling at [the] social worker and ultimately hanging up the phone on both occasions." Appellant had also made several inappropriate calls to the prospective adoptive parents, vacillating from anger and hostility to "crying, begging and pleading[.]"

The social worker had supervised three visits between appellant and Frankie. During the first two visits, which preceded Frankie's placement with his prospective adoptive parents, he seemed happy to see appellant and gave her a hug. Appellant and Frankie had very little interaction during any of the visits. When appellant would tell Frankie that she loved and missed him and he did not respond, appellant asked, "Don't you miss Grandma, too? Don't you still love Grandma?" Appellant spent a significant portion of the second visit reading her camera manual while Frankie played. Immediately after the social worker gave a "five-minute warning" indicating that the visits were about to end, "Frankie took off toward the car and was ready to leave, not showing any outward signs of distress about the visit ending."

Frankie's prospective adoptive parents brought him to the third visit and stayed in the park while the visit took place. While they were driving to the visit, Frankie repeatedly asked them, "You're not going to leave me, right?" and "You're going to stay at the park where I can see you, right?" When they arrived, Frankie held on to his

5

prospective adoptive mother's hand and shook his head when appellant encouraged him to run up and hug her. When Frankie's CASA arrived near the end of the visit, Frankie ran to her and gave her a hug. The prospective adoptive parents reported that Frankie was "irritable and withdrawn" for several days after the visit.

The prospective adoptive parents were initially amenable to allowing appellant to continue seeing Frankie. As soon as appellant discovered that Frankie was having visits with the prospective adoptive parents, she began calling the prospective adoptive mother and her mother, demanding that they stay away from the child. The prospective adoptive parents decided to bring Frankie to the third supervised visit because they were hopeful that she would be put at ease if she met them in person. Instead, appellant continued to make angry phone calls to the prospective adoptive parents. After the prospective adoptive mother stopped answering appellant's calls, appellant began calling her at work and on her cell phone. This social worker sent appellant a certified letter insisting that she initiate no further contact with the prospective adoptive parents or their parents. As a result of appellant's behavior, the prospective adoptive parents were "uncomfortable with ongoing and future contact." If appellant was willing to accept them as part of Frankie's life and maintain appropriate boundaries, they would be willing to initiate further contact by letter.

The social worker concluded that "[Frankie's] prospective adoptive parents have not only raised their own two sons, but raised both of Frankie's half-siblings into adulthood as well. In his current home, he has the opportunity to form and have a relationship with his brother and sister. Frankie states that he 'loves' his brother and his sister and he looks forward to the time he spends with them on weekends. Both his brother and sister are young adults who provide a positive influence in Frankie's life. . . . They are developing a healthy and supportive relationship that will continue throughout the rest of their lives. [¶] . . . During a recent private conversation with his CASA worker, Frankie stated . . . that he is happy in his current home and would like to remain where he is. His caregivers report that he asks them when it will be May 10. He is aware

6

that a court hearing is happening on this date and tells his care providers 'That's when the Judge is going to decide that I can live here forever and ever!'"

CASA also opposed the petition, noting that "Frankie is thriving in his current placement in a loving family, which includes regular and frequent contact with his half-brother and half-sister . . . . Frankie's sister and brother both stated to me that they believe they were 'saved' by the parents Frankie is now placed with, and that they were lovingly shown how to live successful and productive lives away from alcohol, drugs and gangs." CASA stated: "I strongly believe and agree . . . that it is in Frankie's best interest to remain with, and be adopted by, the family in which he is currently placed. I firmly believe it would be detrimental to Frankie on social, emotional, physical, psychological, intellectual, and educational levels to be placed with others currently vying for him. From what I have been told and observed, [appellant] appears to have many issues of her own to contend with. From all that I have seen and heard during the past year, I do not believe she is a good choice to raise Frankie."

Father, who was incarcerated at the time, testified that he wanted Frankie to be placed with appellant. R.L. testified that Frankie told him he wanted to live with appellant during the time he was in R.L.'s custody. A friend of appellant's testified that appellant had been an excellent caretaker of Frankie, even though she was being treated for cancer part of the time he was in her custody. Appellant also testified on her own behalf. She claimed to have a taped phone call from March in which Frankie said he wanted to live with her. She did not recall telling the social worker that she was afraid of father or that he had tried to rape her.

The adoption worker opined that continued visitation between Frankie and appellant was not in the child's best interests due to appellant's emotional instability and her refusal to support his current placement. The adoption worker's attempts to discuss her concerns with appellant were unsuccessful. Instead of improving, appellant was becoming even more emotionally unstable. When the adoption worker called appellant to discuss Frankie's placement or visitation, appellant "immediately gets very angry, lets me know she's calling her attorney and slams the phone down."

7

At the conclusion of the hearing, the court denied appellant's section 388 petition on its findings that appellant had failed to demonstrate either changed circumstances or that removing Frankie from his current placement would be in his best interests. The court proceeded to find that Frankie was adoptable, terminated father's parental rights, and set the matter for a post-permanency planning review. With regard to visitation, the court noted there was no prior order for visitation; rather, appellant had been allowed supervised visits as a matter of courtesy. The court decided to "leave them as courtesy visits at this time" and declined to order any further visitation.

DISCUSSION

Appellant contends the juvenile court abused its discretion in denying her section 388 petition. She claims she proved that circumstances had changed and that removing Frankie from the home of his prospective adoptive parents and placing him with her would be in the child's best interests. She further contends the court abused its discretion in declining to order visitation between herself and Frankie.

Section 388, subdivision (a)(1), provides in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ." "At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child. [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) "[A] primary consideration in determining the child's best interests is the goal of assuring stability and continuity. [Citation.]" (*Ibid.*)

We review the denial of appellant's section 388 petition for an abuse of discretion. (*Stephanie M., supra*, 7 Cal.4th at p. 318.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more

8

inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations.]" (*Id.* at pp. 318–319.)

Appellant contends that circumstances had changed in that Frankie's dependency had progressed to permanency planning and the child had been moved to the prospective adoptive parents' home in violation of the relative placement preference mandate of section 361.3. DSS responds that appellant has forfeited the right to invoke section 361.3 by failing to do so below. Although appellant argued that the relative placement preference applied, she did not assert that Frankie had been moved to the prospective adoptive home in violation of that preference. Appellant has thus forfeited the latter claim. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338.)

In any event, appellant fails to demonstrate that section 361.3 applied here. Section 361.3, which provides that "preferential consideration shall be given to a request by a relative of the [removed] child for placement of the child with the relative" (at subd. (a)), initially comes into play at the dispositional hearing. *After* that hearing, relatives are entitled to preferential consideration only when the child's existing placement fails: "Subsequent to the hearing conducted pursuant to Section 358, whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements." (§ 361.3, subd. (d).)

In the early stages of the proceedings, DSS approved appellant as a potential placement for Frankie and proceeded on the presumption that he would "transition to placement with [appellant] permanently." DSS subsequently determined, however, that placing Frankie with appellant would not be in the child's best interests. As appellant recognizes, "the court denied [her] early request for placement of Frankie, finding her behavior concerning and her not showing a parental role." That ruling, in the form of an order denying appellant's request for de facto parent status, was appealable. (§ 395.) Appellant did not appeal, however. Once the court determined she was not a suitable placement for Frankie, the relative placement preference no longer applied to her. (§ 361.3, subd. (d), italics added ["Subsequent to the [dispositional] hearing

9

conducted pursuant to Section 358, whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section *to relatives who have not been found to be unsuitable* and who will fulfill the child's reunification or permanent plan requirements"].)

Even if the statute did apply, it would not aid appellant. Section 361.3 makes clear that "preferential consideration" does not guarantee preference in placement. In fact, the statute specifically defines preferential consideration as merely a requirement "that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) DSS reported that appellant had been reassessed and once again ruled out as a possible permanent placement for Frankie. Ample evidence supports that conclusion. "Once reunification services are ordered terminated, the focus shifts to the needs of dependent children for permanency and stability." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.) Notwithstanding the relative placement preference, the court's fundamental duty "is to assure the best interests of the child[.]" (*Stephanie M., supra*, 7 Cal.4th at p. 321.)

Appellant's petition sought to have the court remove Frankie from a permanent placement in which he was thriving, one in which he had the best possible chance for permanency and stability. The factors the court must consider in determining whether a relative placement is appropriate plainly weigh against the result appellant advocates here.[5] Given the ongoing concerns about appellant's ability to parent Frankie and the universal indications that the child is thriving in his placement with his prospective adoptive parents, the court found that the requested change in Frankie's placement would not be in his best interests. Nothing about appellant's status as Frankie's

---

[5] In deciding whether to place a minor with a relative, the court considers factors including "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs" (§ 361.3, subd. (a)(1)); "[t]he nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful" (§ 361.3, subd. (a)(6)); and "[t]he ability of the relative to . . . [¶] . . . [p]rovide a safe, secure, and stable environment for the child[;] [¶] . . . [e]xercise proper and effective care and control of the child[;] [¶] . . . [p]rovide a home and the necessities of life for the child[;] [¶] . . . [and p]rotect the child from his or her parents." (§ 361.3, subd. (a)(7).)

10

grandmother or his de facto parent undermines this result. (*Stephanie M., supra,* 7 Cal.4th at p. 321; see also *In re P.L.* (2005) 134 Cal.App.4th 1357, 1361 [de facto parents' limited rights do not include any rights to reunification services, custody, or visitation].) Appellant's section 388 petition was fully litigated in conjunction with the section 366.26 hearing. In light of the evidence presented at that hearing, the court did not abuse its discretion in finding that neither changed circumstances nor Frankie's best interests warranted that he be removed from the custody of his prospective adoptive parents and placed with appellant.

Appellant also fails to demonstrate the court abused its discretion in declining to order visitation. Because the juvenile court "'. . . has been intimately involved in the protection of the child, . . .'" it is best situated to make custody and visitation orders based on the child's best interests. (*In re Chantal S.* (1996) 13 Cal.4th 196, 206.) The court's broad discretion in determining a minor's best interests will not be reversed on appeal unless it is shown the court abused its discretion by making an arbitrary, capricious or patently absurd determination. (*Stephanie M., supra*, 7 Cal.4th at p. 318.)

The facts support the court's decision to continue with visitation on a courtesy basis. In arguing otherwise, appellant urges us to reject inferences that can reasonably be deduced from the facts in favor of different inferences that support her position. This we cannot do. (*Stephanie M., supra*, 7 Cal.4th at pp. 318-319.) The juvenile court was in the best position to decide issues of visitation, and appellant offers nothing to demonstrate that its ruling was outside the broad bounds of its discretion.

The judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

11

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rita L. Neal, County Counsel, Leslie H. Kraut, Deputy County Counsel, for Plaintiff and Respondent.